**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

November 23, 2007

BY HAND DELIVERY

The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street, Room 1040
New York, New York 10007

      Re:    **United States v. Johnny Jamar Jacob**
              **07 Cr. 497 (DLC)**

Dear Judge Cote:

      This matter is scheduled for sentencing on November 30, 2007, at 12:00 p.m.  The Government respectfully submits this letter to provide the Court with additional facts relevant to the defendant's conduct, which are not contained in the Probation Office's Pre-Sentence Report ("PSR").  The additional facts, which relate to items recovered during a consensual search of the defendant's residence and to the defendant's post-arrest statements, demonstrate that the defendant was not a minor participant in the charged money laundering conspiracy and his behavior here was not aberrant.  Accordingly, for the reasons set forth below, the Government respectfully requests that the Court sentence the defendant within the applicable Guidelines range of 30 to 37 months.[*]

**Background**

      In 2006, agents with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") were investigating a drug trafficking organization based in Monterrey, Mexico that was responsible for smuggling hundreds of kilograms of cocaine into the United States.  *See* Pre-Sentence Report ("PSR") at ¶ 9.  As part of that investigation, on October 25, 2006, a cooperating witness working under the supervision of the agents (the "CW") received a call from an individual in Mexico with whom the CW had previously discussed drug trafficking ("CC-1").  *Id.* at ¶ 10.  During the call, CC-1 asked the CW if he could pick up approximately $360,000 in cash from an individual named "Rocky" and hold it for CC-1.  *Id.*  The CW agreed to pick up the money, and CC-1 gave the CW Rocky's phone number and told the CW to call Rocky.  *Id.*

---

      [*]      By letter dated November 16, 2007, which enclosed letters in support of the defendant, defense counsel indicated that he would present any sentencing arguments orally at sentencing.

Later that day, at the direction of the agents, the CW spoke to Rocky over the telephone, and they agreed to meet that night in the vicinity of 51st Street and Seventh Avenue in New York, New York. *Id.* at ¶ 11. During the meeting between the CW and Rocky, who was later identified as Jose Roberto Zumaya, Zumaya called an individual later identified as the defendant, and told him to meet them. *Id.* Shortly thereafter, the defendant met up with Zumaya and the CW in the vicinity of 52nd Street and Eighth Avenue. *Id.* After meeting, the agents observed the defendant and Zumaya walk across Eighth Avenue to a parked car, and each removed a bag from the trunk of the car. *Id.* at ¶ 12. New York State Department of Motor Vehicles records indicate that the car is registered in the name of Deion Jacob. *Id.* at ¶ 15. Zumaya and the defendant then returned to the CW across the Eighth Avenue, and the defendant handed the CW the bag he was carrying. *Id.*

According to the CW, the CW then called CC-1 in the presence of the defendant and Zumaya, and told CC-1 that he had received the money. *Id.* at ¶ 13. Zumaya then spoke to CC-1 as well to confirm that he had delivered the money to the CW. *Id.* After the CW hung up, Zumaya handed the CW the bag he was carrying. *Id.* The CW then left with the two bags, and was later picked up by ICE agents and brought back to the ICE office. *Id.* at ¶ 14. At the ICE office, the agents determined that the two bags contained a total of approximately $360,000 in cash. *Id.*

On or about May 2, 2007, the defendant was arrested at his residence in Brooklyn, New York. Following his arrest, the defendant provided written consent to search his apartment. During the search of the defendant's apartment, the agents recovered the following items, among other things: (1) one 9 millimeter Uzi with one magazine of rounds between the defendant's mattress and box spring; (2) one loaded .380 caliber handgun with an additional magazine of rounds in the defendant's bedroom dresser drawer; (3) 117 rounds of .380 caliber ammunition in a hallway closet; (4) a heat sealing machine and heat sealing bags; (5) two scales; (6) five cell phones;[*] and (7) miscellaneous bank-related documents, some of which contained the name "Robert Zumaya."

Following his arrest, the defendant also provided a written waiver of his <u>Miranda</u> rights, and stated the following, among other things: (1) the .380 caliber handgun belonged to him, and the Uzi belonged to Zumaya; (2) he obtained the handgun years ago from a friend, and Zumaya had brought the Uzi to his apartment three weeks earlier; (3) he had been to Zumaya's house in McAllen, Texas three times before, and was there as recently as two weeks earlier; (4) he has traveled twice to Mexico with Zumaya and another individual; (5) Zumaya stays with him when he comes to New York; (6) Zumaya would often leave him cash before he returned to Texas, and then call the defendant and tell him to deposit the cash into various accounts; (7) when Zumaya visited three weeks earlier, he left the defendant $25,000 in cash to hold for him; (8) the

---

[*]  A sixth cell phone was recovered from the defendant's car pursuant to a consensual search.

defendant later deposited the cash into different accounts in various increments below $10,000 as directed by Zumaya; (9) in September or October of 2006, Zumaya told the defendant he would pay him $2,000 if the defendant would do a favor for Zumaya; (10) the defendant agreed, and later drove to meet Zumaya, and helped him deliver the bags to the CW; (11) Zumaya later bought the defendant a plane ticket to Texas instead of giving him $2,000; and (12) he met Zumaya one year earlier in Times Square while with another friend.

On July 16, 2007, the defendant pled guilty to Indictment 07 Cr. 497 (DLC), which charged him with participating in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). *Id.* at ¶ 3. The parties did not enter into a plea agreement in advance of sentencing. Accordingly, pursuant to the suggestion of the Court in United States v. Pimentel, 932 F.2d 1029, 1034 (2d Cir. 1991), the Government advised the defendant in advance of his plea as to the Government's then-present position regarding the application of the Guidelines to this case. In its Pimentel letter, the Government indicated that it had determined that the applicable Guidelines offense level is 19, the defendant's Criminal History Category is I, and the applicable Guidelines range is 30 to 37 months. *Id.* at ¶ 3.

On November 20, 2007, the Probation Department issued the final PSR, which contains a Guidelines analysis identical to that of the Government and recommends a sentence of 30 months.

## Argument

The Court should sentence the defendant within the applicable Guidelines range of 30 to 37 months. The Guidelines still provide strong guidance to the Court in light of United States v. Booker, 125 S. Ct. 738 (2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), and none of the factors under Section 3553(a) justifies a sentence below the Guidelines range.

### I. The Guidelines Range Continues To Be a Vital Part of a Sentencing Court's Analysis After Booker and Crosby

Although United States v. Booker, 543 U.S. 220 (2005), held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Id*. The Second Circuit has "emphasized that Booker did not signal a return to wholly discretionary sentencing." United States v. Rattoballi, 452 F.3d 127, 132 (2d Cir. 2006); see United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("It would be a mistake to think that, after Booker/Fanfan, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum.").

The Second Circuit recently commented on the considerable weight that the Guidelines warrant, relative to the other factors under § 3553(a). In Rattoballi, the Court stated that "[t]he guidelines cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges." 452 F.3d at 133 (quoting

United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006)).  The Court noted that "the Sentencing Commission is an expert agency whose statutory charge mirrors the § 3553(a) factors that the district courts are required to consider."  Id.  It positively cited commentary by other circuits regarding the importance of the Guidelines.  Id. (citing United States v. Johnson, 445 F.3d 339, 342 (4th Cir. 2006) ("By now, the Guidelines represent approximately two decades of close attention to federal sentencing policy."); United States v. Claiborne, 439 F.3d 479, 481 (8th Cir. 2006) ("The Guidelines were fashioned taking the other § 3553(a) factors into account and are the product of years of careful study."); United States v. Cooper, 437 F.3d 324, 331 n.10 (3d Cir. 2006) ("The federal sentencing guidelines represent the collective determination of three governmental bodies-Congress, the Judiciary, and the Sentencing Commission-as to the appropriate punishments for a wide range of criminal conduct.") (citations omitted); United States v. Mykytiuk, 415 F.3d 606, 607 (7th Cir. 2005) ("The Sentencing Guidelines represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.").

Moreover, the Second Circuit in Rattoballi cautioned that "on appellate review, [it] will view as inherently suspect a non-Guidelines sentence that rests primarily upon factors that are not unique or personal to a particular defendant, but instead reflects attributes common to all defendants.  Disparate sentences prompted the passage of the Sentencing Reform Act and remain its principal concern."  Rattoballi, 452 F.3d at 133-34.  Indeed, the Court has stated that the Guidelines should serve as "a benchmark or a point of reference or departure," and that "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."  United States v. Fernandez, 443 F.3d 19, 27, 28 (2d Cir. 2006) (citations omitted).

Here, the applicable Guidelines range is 30 to 37 months' imprisonment, and a sentence within the Guidelines range is fair and appropriate.

## II.    The Defendant Is Not Entitled To A Minor Role Reduction

The Sentencing Guidelines provide that a defendant's base offense level may be reduced by two levels if the defendant was a "minor" participant.  See Guideline 3B1.2(b).  The commentary defines a "minor participant" as a defendant "who is less culpable than most other participants."  U.S.S.G. § 3B1.2(b) & Application Notes 4-5.  In fact, an adjustment under Section 3B1.2 is appropriate only when a defendant is "*substantially* less culpable than the average participant."  U.S.S.G. § 3B1.2(b), Application Note 3(A) (emphasis added).

A defendant has the burden of proving by a preponderance of the evidence that he is entitled to a mitigating role adjustment under Section 3B1.2 of the Guidelines.  See United States v. Yu, 285 F.3d 192, 200 (2d Cir. 2002); United States v. Castaño, 234 F.3d 111, 113 (2d Cir. 2000); United States v. Colon, 220 F.3d 48, 51 (2d Cir. 2000).  Moreover, a district judge's analysis of the defendant's role in criminal activity is "'highly fact-specific and depends upon the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of

the criminal enterprise.'" United States v. Carpenter, 252 F.3d 230, 234 (2d Cir. 2001) (quoting United States v. Shonubi, 998 F.2d 84, 90 (2d Cir. 1993)).

The Second Circuit has repeatedly emphasized that a mitigating role reduction "'will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' or 'minimal' as compared to the average participant in such a crime.'" United States v. Carpenter, 252 F.3d at 235 (quoting United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999)); accord, e.g., United States v. Jeffers, 329 F.3d 94, 103 (2d Cir. 2003).

Here, any argument that the defendant is substantially less culpable than the average participant in a money laundering conspiracy, and is therefore deserving of a minor role reduction, should be rejected. It is evident from the surveilled meeting with the CW, the defendant's post-arrest statements, and the items recovered from the defendant's residence that the defendant played a significant role in the conspiracy. With respect to the meeting with the CW, the defendant was responsible for driving approximately $360,000 to the meeting location. He also supplied the car as it was registered in the name of Deion Jacob. He then assisted Zumaya with unloading the bags from the trunk, carried one of them across the street, and handed it to the CW. Thereafter, he was present when both the CW and Zumaya confirmed the transfer of the bags to the CW over the telephone with CC-1, a known drug trafficker. According to the defendant, he expected to be paid $2,000 for his role in this meeting but was instead paid with an airline ticket to Texas. These facts alone establish that a minor role reduction is not appropriate because they demonstrate the level of trust between the defendant and Zumaya, the critical importance of the defendant's actions to the success of the conspiracy, and the defendant's awareness of the existence and the role of at least one other co-conspirator, CC-1.

However, the defendant's post-arrest statements and the items recovered from his apartment only reinforce the Government's position that the defendant was an integral member of the conspiracy who is not entitled to any role reduction. Following his arrest, the defendant admitted that he had done much more in furtherance of the conspiracy than help deliver the two bags containing approximately $360,000 to the CW. Only two to three weeks prior to his arrest, he deposited approximately $25,000 into various accounts for Zumaya in denominations of less than $10,000, presumably to avoid the $10,000 federal reporting requirement. Moreover, he often allowed Zumaya to stay with him when he visited from Texas, and he visited Zumaya three times in Texas. Perhaps more importantly however, the defendant admitted that he traveled to Mexico with Zumaya and another individual on two different occasions. This is a considerable amount of contact for two individuals who had apparently met only one year earlier, and suggests that the defendant's participation in the conspiracy was not limited in duration. Moreover, the defendant was in possession of various bank documents that contained account information for the bank accounts into which he deposited cash for Zumaya. These documents reveal the close nature of the relationship between the defendant and Zumaya, and also suggest that the $25,000 was not the only sum that the defendant deposited in furtherance of the conspiracy.

Finally, there are the two guns, including an Uzi, the two magazine clips, the 117 rounds of ammunition, the heat sealing machine, the two scales, the heat sealing bags, and the six cell phones recovered from the defendant's residence and car.  While the defendant has only been charged with participating in a money laundering conspiracy, these items strongly suggest that he was also involved in narcotics-related activity.  They also totally undermine any argument that he was a minor player in the money laundering conspiracy or that the conduct to which he has pled represents aberrant behavior.   Accordingly, the defendant is not entitled to a minor role reduction, and a sentence within the applicable Guidelines range of 30 to 37 months is appropriate.

### III.     The 3553(a) Factors Do Not Counsel In Favor Of Leniency

As the Court is well aware, Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2)."  That sub-paragraph sets forth the following purposes:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> © to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range under the Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  See 18 U.S.C. § 3553(a).

Here, the Government argues that the application of the Guidelines to this defendant results in a sentencing range of 30 to 37 months.  The Court should strongly consider that Guidelines range in imposing sentence.

As discussed above, the defendant played a significant role in a money laundering conspiracy that involved the transfer of hundreds of thousands of dollars for a known narcotics trafficker.  He used his residence and his car in furtherance of the conspiracy, and traveled to Mexico and Texas on multiple occasions with one of his co-conspirators.  He and his co-conspirators also employed the U.S. banking system as a tool for the conspiracy.  In addition, he was in possession of two guns, including an Uzi, and various items of narcotics paraphernalia.

The offense is clearly a serious one.  Furthermore, while the defendant has no prior convictions, the items recovered from the defendant's residence reveal in no uncertain terms that the protection of the public, specific and general deterrence, and promoting respect for the law are all vital concerns in this case that should be reflected in the defendant's sentence. Accordingly, a sentence within the Guidelines range is warranted because the 3553(a) factors do not counsel in favor of a below-Guidelines sentence.

## **Conclusion**

For all of these reasons, the Government respectfully requests that the Court impose a prison sentence within the 30 to 37 months range provided by the Guidelines.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:    /s/ Brendan R. McGuire
Brendan R. McGuire
Assistant United States Attorney
(212) 637-2220

cc:    Michael Soshnick, Esq. (by fax)
Counsel for Johnny Jamar Jacob

Veronica M. Dignam
U.S. Probation